## GARD, Appellant, v. ARNOLD, et al.

### Division One, June 30, 1900.

**Setting Aside Deed of Gift:** THREATS: DEFERENCE TO TRIAL JUDGE. In a suit to set aside a deed of gift of land from a mother to a daughter on the ground that it was obtained through threats and intimidation, where all the evidence is delivered orally in open court, and there is ground to believe that the entire suit was worked up by a busy-body, who was to get $50 if the deed was set aside, and the evidence is conflicting and the conclusion to be reached depends on the credit to be given the various witnesses, the chancellor who lives in the same vicinity with them is in a better position to test their credibility, and this court will not interfere with his findings.

Appeal from Pettis Circuit Court.—*Hon. George F. Longan,* Judge.

AFFIRMED.

*Sangree & Lamm* for appellant.

(1)   Appellant being old, ignorant and afflicted and living with her daughter and son-in-law at the time, any trace of coercion, surprise, or over solicitation will avoid a voluntary conveyance such as this.   Such transaction will be scanned closely by a court of equity, especially where the beneficiaries owed a duty to protect their mother, where she parts with a considerable property necessary to her subsistence and independence, where she did not consult with disinterested advisers.   Bell v. Campbell, 123 Mo. 1; Turley v. Edwards, 18 Mo. App. 676; Hensinger v. Dyer, 147 Mo. 219.   And the doctrine of the following authorities bear upon one, or the other, of the salient features of the case,

while not directly in point, on the whole case. Holliway v. Holliway, 77 Mo. 392; Cadwallader v. West, 48 Mo. 483; Yosti v. Laughran, 49 Mo. 594; Martin v. Baker, 135 Mo. 496. (2) The testimony of the witnesses at the immediate time of the execution of the deed is of very little probative force in this kind of a case. It was not to be expected that acts of coercion, or appearances of coercion, would exist before strangers at such time and place. The poison had been injected before. (3) The charge being akin to fraud, the defendants should not have contented themselves with a general blanket denial but should have made full disclosures of their side, if any, of the facts leading up to and surrounding the execution of this suspicious deed. Directors v. Levy, 1 Edw. Chancery, 316; Scull v. Reeves, 3 N. J. Eq. 84; Vreeland v. N. J. Stone Co., 25 N. J. Eq. 140.

*H. T. Williams* for respondents.

(1) Conclusions of fact drawn by the trial court will be deferred to because of its superior advantages for weighing the evidence and judging of the credibility of witnesses. Parker v. Roberts, 116 Mo. 65; Mathias v. O'Neil, 94 Mo. 520. This is especially the rule where, as in this case, all the witnesses testified orally before the trial court. Chouteau v. Allen, 70 Mo. 336; Lins v. Lenhardt, 127 Mo. 271. And when the evidence is conflicting the appellate court will strongly incline to sanction the trial court's finding. Erskine v. Lowenstein, 82 Mo. 30. (2) The decision of the trial court rests on the credibility of oral testimony and unless it is clearly against the preponderance of the evidence should be sustained. Taylor v. Short, 137 Mo. 517; Snell v. Harrison, 83 Mo. 651. (3) Appellant for the first time in the progress of the case, raises in this court an objection to respondent's answer because it was a general denial. But this objection, not having been presented to the trial court and

not passed upon by him should not be considered here. Alexander v. Hayden, 2 Mo. 211; Swearengen v. Newman, 4 Mo. 456; Burdoin v. Trenton, 116 Mo. 358; 1 Vol. Pattison's Digest, p. 167, par. 1531 to 1825. This question is specifically passed upon in Kinzer v. Kinzer, 130 Mo. 131. (4) Appellant having made no showing to the contrary it must be presumed that the trial court applied the law correctly and as laid down in Turley v. Edwards, 18 Mo. App. 676; Bell v. Campbell, 123 Mo. 1. The whole evidence justly weighed by the trial court being insufficient to warrant his taking the land from Susan Arnold and giving it back to appellant, the decision should rest undisturbed. Daily v. Daily, 125 Mo. 96.

BRACE, P. J.—This is a suit in equity to set aside a deed dated July 29, 1896, duly executed and acknowledged by the plaintiff, Barbara A. Gard, and on the same day duly recorded, whereby she conveyed to her daughter, the defendant, Susan A. Arnold, 35 acres of land in Pettis county.

The substantive facts alleged in the petition, for the relief sought are, that previous to the execution of said deed the plaintiff being persuaded thereto by her son-in-law, the defendant William Arnold, husband of the said Susan A., had set fire to and destroyed a vacant shanty of little value on a neighboring farm belonging to one Edward Imhauser. That the said defendants knowing this fact, by threatening to have her prosecuted for the crime and sent to the penitentiary, so intimidated her as to induce her to execute the deed aforesaid. The answer was a general denial. The finding and judgment was for the defendant, and the plaintiff appeals.

It appears from the evidence that at the time the deed was executed, the plaintiff was a widow aged about 58 years and 5 months. That she had been twice married and had five living children, one daughter by her first husband, and

two sons and two daughters by her second husband; of the latter, the defendant Susan A. Arnold was one. That she was receiving a pension of $8 per month from the government. That she formerly lived on a farm in Morgan county. That in the year 1892 or 1893, she purchased a tract of land in Pettis county, containing 75 acres, of which the 35 acres in question forms a part, moved to it and thereafter made it her home, managing the farm and conducting all her business herself, her children having grown up, some of them married, and all gone off to do for themselves. This continued until the summer of 1894, when she made an arrangement with the defendant William Arnold, the husband of her said daughter, Susan A., by which they and their family, consisting of themselves and four small children, were to come and live with her on the farm. Theretofore they had been living in Johnson county, and were in destitute circumstances. They came, and on the 14th of August, 1894, she executed and acknowledged in due form a written lease of that date whereby she leased "her farm and all improvements" to Arnold for one year from and after the first day of March, 1895, upon the following terms: "Arnold is to pay one-third of all crops of grain that may be raised, the same to be put in cribs or granary. She, Mrs. Gard, is to live in the same house with the Arnolds, together with any other members of her family, so long as they conduct themselves in a peaceable manner. All the parties are to have the same use of the house and other buildings and pasture. Mrs. Gard is to have a garden in case she so desires. Arnold is to have the privilege of clearing up any part of timber land and for compensation shall receive an equal amount of land next to it free of rent. The lease also provides that Arnold shall cultivate the land well, and use the premises for no other purpose, and will not sublet, sell or assign his term without Mrs. Gard's written consent, and guard the

property from all damages and keep the same in good repair and forfeit his lease if he does not keep these provisions, and at the expiration of this lease or a breach of it by him, he will, without further notice of any kind, quit and surrender the possession and occupancy of said premises in as good condition as careful use and natural wear and tear will permit," etc.

Shortly after these family relations had been thus established on the farm, probably in September following, the plaintiff had a will prepared and executed in due form. The evidence tends to prove that she had formerly been in better circumstances, and had made some gifts or advancements to her children other than to her daughter, Susan A., and to her youngest daughter, Rena, and by this will she devised the farm at her death to Susan A., subject to a legacy of $200, to be paid to Rena, $10 to the oldest child, Mary, and $20 each to the other children. Afterwards, probably in November following, she burned the vacant·cabin or shed on Imhauser's farm. Thereafter these people lived together on the farm without noticeable incident until some time in the summer of 1896, probably in June, when the old lady becoming dissatisfied with the provisions of her will destroyed it. Afterwards, about the 11th day of July, 1896, the defendant, William Arnold, was taken sick with intermittent fever. The doctor and some of the neighbors were sent for, and to two of these neighbors he expressed the opinion that he might not get well, and would die more contented if the old lady would give him a little home for his family on the farm, even if it was not more than ten acres.

Afterwards, on the 29th of July, 1896, the plaintiff came with her daughter, Susan A., and her husband to Sedalia, had the deed in question prepared, executed and acknowledged and recorded, paying for the same with money she borrowed of a friend in Sedalia for that purpose, stating

that her object was to provide a home for her daughter. They returned home, and the arrangement then seems to have been that one of the old lady's unmarried sons should come to live with her, and Arnold was to erect a little house and other necessary improvements on the 35 acres, move on to it with his family as soon as might be, and thereafter make it their home. This he proceeded to do, borrowing some money on the land, for the purpose, and on the first of March, 1897, he moved with his family to the little home thus made for them on that tract. About this time one Martin Scheerer appears upon the scene; he was examined as a witness for the plaintiff and testified as follows:

"I live in Morgan county. I have known Mrs. Gard for 30 years, an old acquaintance. I have talked with William Arnold last summer. In that conversation, after this will had been destroyed, he said this, or this, in substance: that he would send the old lady to the penitentiary for burning Imhauser's house, if she, the old lady, didn't give his wife a deed to part of that land there, or 35 acres of land out there. Yes, sir; I say he did."

"Cross-Examination: Yes, sir; I live in Morgan county. Yes, sir; I did know Mrs. Gard for 30 years. I am farming and trading, that's my business. If you have a good horse, I'll swap with you. Yes, sir; I trade in houses and lots; I swap in anything I come across. If you have got anything, come and see me. Yes, sir; I am trading. (Q.) You helped her trade? (A.) The old lady was an old lady, and I wanted to see that everything was in good shape. I was pretty near raised with her. I have no interest in it, in any shape or form. She said if she regained this, she would pay me for my trouble, and if she didn't I done it for accommodation. I have not talked it over with her. She said I got $50, if I wanted it, and I said, Mrs. Gard, I don't want it if you don't want to pay it. Yes, sir; I have been helping

her get evidence. Yes, sir; I went around to get the witness because the old lady couldn't run around. I saw her before she brought the suit. (Q.) You advised her to bring the suit? (A.) No, sir. (Q.) You advised her to get the land back? (A.) Another gentleman advised her. I didn't tell her she ought to get the land back, she asked another gentleman, a lawyer, and he said she could get the land back, by this transaction, and she came to me. Yes, sir; she had the 45 acres of land there, after she had given Arnold this 35 acres. Yes, sir; there was $165 against it. That was worth about $20 an acre. $1,000 for the land. (Q.) Was she offered $1,000 for the land? (A.) Yes, sir. I did help her to trade that off. Yes, sir; I helped trade that 45 acres off for some land in Morgan county. (Q.) What did she do with that? (A.) I didn't have nothing to do with the last transaction. I traded this 45 acres for 80 acres down there, and it was a good home. No, sir, I didn't help her trade again. (Q.) Who got the 45 acres? (A.) Mr. Otten, a nephew of mine. (Q.) If she wins this suit you are to get $50? (A.) If she wants to pay me; if she wants to, she can, but if she don't want to she don't have to. Yes, sir; I have gone to a great deal of trouble in this case, riding round for witnesses, etc."

One of the first results of the interference of this trading gentleman in the affairs of the old lady was an arrangement made with Imhauser for the payment for $30 for the burnt shanty, which having been paid by Sheerer to Imhauser this suit was commenced on the 16th of April, 1897. The last result of his labors seems to have been the evidence introduced for plaintiff on the trial on the 21st of October, 1897, which as to the alleged threats, consisted of the evidence of himself, the old lady, her oldest daughter and her husband and another witness, all of whom were positively contradicted by defendants, and the probative force of their

evidence much impaired by the uncontroverted facts and circumstances of the case.

After a careful consideration of this evidence in connection with all the other evidence in the case we are satisfied that the chancellor who tried it discerned the truth of the matter and reached the proper conclusion. The evidence was conflicting; and the conclusion to be reached depended largely upon the credit to be given to the witnesses. All the evidence was delivered orally in open court by the witnesses. They were of the vicinage and the chancellor was in a much better position to weigh and properly estimate the value of the evidence than we are, and even if we entertained a serious doubt as to the correctness of his conclusion we would be inclined to defer to his judgment, but as it is we have no hesitation in affirming the judgment of the circuit court. It is accordingly so ordered.

All concur.